UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON TREADWELL,

     Petitioner,

                                CASE NO. 5:10-cv-10441

v.

                                HON. JOHN CORBETT O'MEARA

DAVID BERGH,

                                MAG. CHARLES BINDER

     Respondent.

_____

## Answer in Opposition to Petition for Writ of Habeas Corpus

## Introduction

Petitioner, Jason Treadwell, and three of his pals inexplicably went on a crime spree. They stopped several cars, pretended to be the police, and attempted to rob them. Their actions affected multiple lives forever, none more so than the family of Officer Charles Phipps, who was gunned down on the street by one of Treadwell's friends as all of the men fired their weapons.

As result of his Wayne County jury convictions of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a), carjacking, Mich. Comp. Laws § 750.529a, two counts of armed robbery, Mich.

Comp. Laws § 750.529, assault with intent to murder, Mich. Comp. Laws § 750.83, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and felony firearm, Mich. Comp. Laws § 750.227b, Warden David Bergh now holds Treadwell in custody in the Michigan Department of Corrections.  He is currently serving a life sentence for the murder conviction, four terms of 23 years, 9 months-to-50 years for the carjacking, armed robbery, and assault convictions, 2-to-5 years for the felon-in-possession conviction, and a mandatory 2-year sentence for the felony-firearm conviction.

Treadwell commenced this action under 28 U.S.C. § 2254 by filing a petition with this Court.  The State understands the petition to be raising the following claims:

I.     Appellant's convictions must be reversed and the charges dismissed, as the prosecution failed to present legally sufficient evidence that he was a principal or an aider and abettor in violation of his right to due process of law.

II.    Appellant is entitled to a new trial where defense counsel provided constitutionally ineffective assistance by failing to move to sever unrelated offenses.

III.   Defendant was denied a fair trial due to ineffective assistance of counsel because his attorney failed to investigate and prepare for trial.

2

IV.   Defendant was denied a fair trial because his attorney failed to call and exculpatory defense witness.

V.   Defendant was denied a fair trial because his attorney failed to seek an expert witness to testify as to false identification and false confessions.

Should the Court interpret the petition to be raising different claims, the State requests an opportunity to file a supplemental pleading.

The State now answers the petition and requests that it be denied. With respect to the bars that preclude habeas review, the State asserts the following in conformance with Habeas Rule 5(b):

### A.   Statute of Limitations

The State is not arguing that any of Treadwell's habeas claims are barred by the statute of limitations.

### B.   Exhaustion

The State is not arguing that any of Treadwell's habeas claims are barred by the failure to exhaust a claim for which a state court remedy exists.

### C.   Procedural Default

The State asserts that Treadwell has procedurally defaulted his third, fourth, and fifth claims, as more fully discussed below.

**D.   Non-retroactivity Doctrine**

Treadwell may not rely on rules of law that were recognized after his conviction became final.  The State is not arguing that any of Treadwell's claims are barred by the non-retroactivity doctrine.

## Statement of the Case

### A.   Trial Facts

**Carjacking and Armed Robbery of John Feazell**

At around 3:00 a.m. on April 28, 2006, John Feazell was driving home in the area of Joy and Longacre in Detroit.  (1/30/07, Trial Tr. at 71.)  When he was near the intersection of Rutland and Dover, a gray Honda CRV[1] pulled in front of him and cut him off, causing him to stop his vehicle.  (*Id.* at 72-73.)  He identified that vehicle through photographs at trial.  (*Id.* at 73.)  When the SUV cut him off, he saw three people get out of the vehicle.  (*Id.* at 73-74.)

The three people who got out of the car were all African American men with weapons; one appeared to be older than the others.  (*Id.* at 74-75.)  The eldest of the three was Brion McConnell according to Feazell and he was carrying what looked like a 44 magnum.  (*Id.* at 74-76.)  At that point, Feazell realized there were four people in the SUV; the fourth stayed in the back passenger seat and pointed a gun out of the window.  (*Id.*)

---

[1] Brion McConnell's aunt, Jessie Guiden, testified that she gave McConnell permission to use her 2006 silver Honda CRV the night of the crimes.  (1/30/07, Trial Tr. at 66.)

The three men identified themselves as the police, pointed their weapons at him and ordered him out of his car. (*Id.* at 73, 76.) One of the other men was short, about 5'2"; this person had a weapon that looked like a Tech 9. (*Id.* at 76.) The third man who got out of the SUV had a 9-millimeter. (*Id.*)

As Feazell was standing near his car, his gold chain and cell phone were taken. (*Id.* at 76-78, 81.) The short man asked if he could shoot Feazell. (*Id.* at 82.) That man was Treadwell. (*Id.* at 83-84.) But, the man with the 9-millimeter told Treadwell not to shoot and instead told Feazell to run, which he did. (*Id.* at 82, 84.) His car was also taken from him. (*Id.* at 81, 84.)

Feazell ran westbound on Dover and when he got to Longacre, he saw a green Honda or Hyundai with an out-of-state license plate going northbound on Longacre. (*Id.* at 84-85.) After the green Honda drove by him, and when he got to Archdale, Feazell saw the same green Honda parked in a driveway. (*Id.* at 86.) He saw the same silver SUV by where the green Honda was parked and saw individuals pointing guns at the person in that green Honda. (*Id.* at 87-88.) They announced they were the police, just like they did to him minutes

6

before. (*Id.*) When they were done with the robbery, they drove past Feazell, which was the only reason he knew it was the same people. (*Id.* at 88.)

Feazell called the police. Soon after, his vehicle was found on the next street over. (*Id.* at 88-89.)

Later, Feazell attended some lineups relative to this case, but he did not identify anyone. (*Id.* at 89-90, 91.) Despite that, Feazell said he was sure Treadwell was one of the men involved in robbing and carjacking him that night. (*Id.* at 90.)

**Armed Robbery of Dewayne Smith**

At about the same time on April 28, 2006, Dewayne Smith was driving a green Honda Accord with an out-of-state license plate in the area of Archdale and Cathedral in the Detroit. (*Id.* at 110.) He drove up a driveway on Archdale. At that point, a minivan pulled up and three to five guys hopped out and announced that they were the police and ordered him to turn around. (*Id.* at 111-12.) All of the men were African American and had weapons. (*Id.* at 112-13.) Smith said there was a short man, a taller man, and a medium-height man. (*Id.* at 112.) The short man hit Smith in the head with a gun and took his money

7

and wallet.  (*Id.* at 113.)  Smith was then ordered to run to the corner, which he did.  (*Id.* at 111, 115.)  He was unable to identify any of the men who robbed him, but he testified that the short person was similar in height to Treadwell.  (*Id.* at 112, 115, 124.)

On cross-examination, Smith testified that three men getting out of the van, but said there were three to five men because he thought some others stayed back.  (*Id.* at 116-19.)  Smith admitted that he could not outright identify Treadwell as the shorter person that hit him.  (*Id.* at 120-23.)

**Assault and Armed Robbery of Marie Leinonen**

Again, at about the same time on April 28, 2006, (3:00 a.m.) Marie Leinonen testified that she was in the area of Ashton and Faust in the City of Detroit; she was looking to buy weed in her red Mercury Sable. (*Id.* at 125-26.)

As she was driving, an SUV pulled in front of her and cut her off from going forward.  (*Id.* at 126.)  Four African American men got out of the SUV with guns and were yelling "Police police."  (*Id.*)  One of the men fired a shot at her as she tried to back up and told her open the door.  (*Id.* at 126-27.)  When she opened the door, she was bashed in the

head by the short man and her purse was taken.  (*Id.* at 127-28.)

Despite the blood in her eyes, Leinonen put her car in gear and drove

away "like a maniac."  (*Id.*)  As she was driving away, the men fired

shots at her car, causing her windows to blow out and bullet holes in

her car.  (*Id.* at 127-33.)  She then drove to a gas station to call police.

(*Id.* at 127.)  The short man who bashed her in the head was the same

height as Treadwell.  (*Id.* at 128.)

On cross-examination, Leinonen acknowledged that she did not

identify anyone in the lineups, but she identified Treadwell as being

present when she was assaulted and robbed.  (*Id.* at 136-37, 139-40.)

**Myra Andrews and Roland Wellborn Encounter**

At about 3:35 a.m., Myra Andrews was driving her Buick Century

in the area of Faust and Belton in Detroit.  (1/31/07, Trial Tr. at 16-18.)

Roland Wellborn was with her in the car.  (*Id.* at 17, 27-28.)  While she

was stopped at a stop sign, a grey Honda CRV cut her off and prevented

her from going forward.  (*Id.* at 18, 28.)  When the Honda cut her off,

Andrews could see four African Americans in it; she believed they were

men.  (*Id.*)

A man with a muscular build got out of the passenger seat of the Honda and was wearing all black and a black skull cap with braids coming out from underneath it.  (*Id.* at 18-19, 29.)  He had a gun.  (*Id.* at 19, 29.)  At that point, Andrews put her foot on the gas, and pulled her car back into a driveway, and then went down the street.  (*Id.* at 19, 30.)  When she was in the driveway, Wellborn jumped out of the car and ran because Wellborn knew the man who got out of the SUV was not alone.  (*Id.* 19, 30-31.)  When Andrews reached Joy Road she saw someone laying in the street and a car crashed against a pole.  (*Id.* at 23.)

On cross-examination, Andrews admitted that she did not pick anyone out of the lineup she attended.  (*Id.* at 26.)

**Investigation of the Crime Spree**

Detroit Police Evidence Technician Lori Briggs testified that she documented a crime scene at Joy and Longacre at approximately 4:50 a.m. on April 28, 2006.  (*Id.* at 33-35.)  On Joy, she found six R & P nine millimeter casings, a spent bullet, suspected blood, and a Sprint Pocket

10

PC.[2]  (*Id.* at 36-37, 43.)  Down the street, at Joy and Southfield, there was a beige minivan that was crashed against a light pole.  (*Id.* at 35-36.)  There appeared to be bullet holes in the van and shattered windows.  (*Id.* at 37-39.)  In the minivan's console, Off. Briggs recovered a Glock pistol that was standard issue for members of the Detroit Police Department.  (*Id.* at 47.)

Detroit Police Department (DPD) Officer Kirk Williams testified that he was on duty in the early morning hours of April 28, 2006. (1/30/07, Trial Tr. at 37.)  Off. Williams and his partner were dispatched to Joy and Longacre where they encountered an unoccupied van at Southfield and Joy that had run into a pole with the windows shot out. (*Id.* at 37, 42.)  Down the street were other scout officers and they were standing near Off. Phipps, who was lying in the road deceased.[3]  (*Id.* at 37-38.)

---

[2] Several other spent bullets and casings were collected from the homicide scene, from Off. Phipps vehicle, from Leinonen's vehicle, and spent slugs from Phipps' body that were collected during the autopsy. (1/31/07, Trial Tr. at 49-56.)  This evidence was admitted by stipulation. (*Id.*)

[3] Off. Phipps suffered nine gunshot wounds as reflected in the medical examiner's report admitted by stipulation.  (1/31/07, Trial Tr. at 112.)

Off. Williams went to the minivan to look for Phipps' service weapon and found it in the locked center console along with Phipps' wallet.  (*Id*. at 41-42.)

DPD Off. David Pauch, an expert in the field of firearms and tool mark identification, testified that he examined casings and bullets relative to this case, which came from two different scenes, one scene being the area of Joy and Longacre and the other being 8242 Faust. (1/31/07, Trial Tr. at 57-58.)  He found that the casings, which were R & P (Remington Peters brand) nine millimeter casings, were all fired from the same weapon, as was the bullet recovered from Off. Phipps' body. (*Id*. at 63-65, 66 (#17271704).)  As far as the two other nine millimeter bullets, they had been fired from different weapons.  (*Id*. at 67-68.) Thus, of all of the casings and bullets he analyzed, Off. Pauch could say that two different nine millimeter weapons had fired them.  (*Id*.)  But, none of the bullets or casings had been fired from Off. Phipps' service weapon.  (*Id*. at 66.)

William Steiner, an expert forensic chemist at the DPD Crime Lab, testified that he performed gunshot residue tests on eight samples collected from the interior of the silver Honda that the perpetrators

12

drove the night of the crime spree.  (*Id.* at 77-78.)  These samples were taken from the driver's seat, the driver's seat roof, the front passenger seat, the armrest and door, the front passenger roof, the rear side roof, the rear passenger seat and door panel, and the rear passenger roof. (*Id.* at 78).  All eight samples were positive for gunshot residue.  (*Id.*)

**Treadwell's Confession to Actively Participating in the Crime Spree**

Detroit Police Investigator Barbara Simon testified that she interviewed Treadwell just days after the crime spree.  (*Id.* at 113-14.) Inv. Simon advised Treadwell of his constitutional rights by a standard form (with another officer in the room); he signed and initialed that form agreeing to talk to her without an attorney present.  (*Id.* at 114, 123.)  She took the statement in question and answer form, where she wrote out the question and then wrote out the answer that Treadwell gave her.  (*Id.* at 114-15.)  After the statement was completed, she allowed Treadwell to review it.  (*Id.* at 115.)  Treadwell then signed his name on the bottom of each page indicating that he had read the statement and it was accurate.  (*Id.* at 115-16.)  Treadwell's statement to Inv. Simon was read into evidence:

Q    Mr. Treadwell, what can you tell me regarding the fatal shooting of Police Officer Charles Phipps?

A    All of this started Thursday night.  I was looking for a ride to come over to the west side.  I saw Brion, Elgie, and Tony.  I don't know Tony's real name.  We were all on Marx (sic).  I asked for a ride to the west side.  As we were driving down the Southfield Freeway, Elgie was driving.  Elgie said, 'Why is that car behind me driving so motherfucking close?'  That's when Elgie stopped the car, jumped out of the car, and began shooting at the car that was behind us.  The car that was behind us started backing up.  That's when Elgie jumped back into the car, and we pulled off.

We came up at Joy Road and Southfield.  We were going on Rutland.  I say this mini van coming down Joy Road.  Elgie was trying to make a left-hand turn as the mini van was getting closer.  That's when Elgie stopped the Honda we were in.  Elgie got out.  He had his gun and began shooting at the car.  We all jumped out with our guns.  The officer looked like he was reaching for something.  That's when Elgie start shooting.  The officer tried to run.  That's when we start shooting[.] [and he signed his name Jason Treadwell.]

Q    Mr. Treadwell, your attorney, Harry Buffman, came to talk to you at the southwest station, Second Precinct.  After your attorney left, you told me that you wanted to continue the interview.  I said 'Okay,' and PO Cynthia Raymond was also present; is that correct?

A    Yes.  [And he signed his name, Jason Treadwell and so did Officer Cynthia Raymond.]

Q    Mr. Treadwell, continue.

A    The officer fell, and Elgie kept on shooting.  After that, we all jumped back in the truck and drove down the

14

street on Rutland to my sister-in-law's house, Felicia. We all went in the house.  We went in the basement. We all talked about the shooting.  I said something about overkill.  Elgie said, 'Man, don't say anything. This is serious.'  And he told me to keep my mouth closed.  He said, 'If one go down, we all go down.' Nobody said nothing.

Q      Mr. Treadwell, what kind of gun did you all have?

A      Elgie had a Mack 9, like a machine gun.  Brion had a 357.  I think Tone had a silver gun.  I don't know what kind.  And I had a 38[.]  [and he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, how many robberies did you all do that night?

A      Only one person got robbed.  The police officer was killed.  We attempted to rob other people, but they got away.  [He signed his name, Jason Treadwell.]

Q      Mr. Treadwell, was anything taken from the police officer?

A      I don't know if they took anything[.]  [and he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, what happened to the gun you all had?

A      I don't know what they did with their guns, but I kept mine until I went back to the east side the next day.  I put the gun behind a vacant house on Marx.  I can point out the house for you.  [And he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, have you talked to Brion, Elgie, or Tone since the shooting?

15

A Elgie called me today, 5-1-06, on my cell phone when he heard that I was going to turn myself in[.]  [and he signed his name, Jason Treadwell.]

Q Mr. Treadwell, have you seen - - have you ever seen the police officer that was killed before?

A No.  [And he signed his name, Jason Treadwell.]

Q Mr. Treadwell, why was the officer shot?

A I don't know.  I guess Elgie was trying to prove something[.]  [and he signed his name, Jason Treadwell.]

Q Mr. Treadwell, how long have you known Brion, Elgie, and Tone?

A I have known Brion and Elgie all my life.  I've only known Tone a couple years[.]  [and he signed his name, Jason Treadwell.]

Q Mr. Treadwell, whose vehicle were you all riding in?

A Brion's aunt's car.  [And he signed his name, Jason Treadwell.]

Q Mr. Treadwell, did I threaten you in any way to make a statement or answer any questions?

A No.  [And he signed his name, Jason Treadwell.]

Q Mr. Treadwell, did I promise you anything to make a statement or answer any question?

A No.  [And he signed his name, Jason Treadwell.]

Q Mr. Treadwell, were you deprived of food, water, or use of the restroom?

A No.  [And he signed his name, Jason Treadwell.]

16

Q      Mr. Treadwell, are you under any doctor's care?

A      No.  [And he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, are you on any type of medication?

A      No.  [And he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, do you use any type of drugs?

A      Yes.  I smoke weed.  [And he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, did you see me white out your statement the way you told me?

A      Yes.  [And he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, did you have a chance to read this statement and make corrections?

A      Yes.  [And he signed his name, Jason Treadwell.]

Q      Mr. Treadwell, [are] the questions you answered and the statement you gave true?

A      Yes.

Q      Mr. Treadwell, is there anything else you want to say?

A      Yes.  I'm sorry for what happened to the police officer. I had no control over what happened.  If I could change things, I would.  I would never have asked for a ride.  I want to say I'm sorry to the officer's family.  I'm sorry. And to everyone else that was hurt[.]  [and he signed his name, Jason Treadwell.

(*Id*. at 116-22.)  In his confession, Treadwell admits to being present at

the scenes of the crimes, being actively involved, and to getting out of

the car and firing his gun at Off. Phipps.  (*Id*. at 117-19.)

17

On cross-examination, Inv. Simon said that she spoke to Treadwell before she started writing his statement, but she did not know how long that lasted. (*Id.* at 125.) They stopped the interview once so Treadwell could eat and another time so he could talk to his attorney. (*Id.* at 125-26.) She noted that the lights were on in the room and no one was wearing a mask. (*Id.* at 130.) Simon also confirmed that Treadwell was crying during parts of the interview. (*Id.* at 131-32.)

**Treadwell Later Denied Confessing**

Treadwell took the stand in his own defense at trial. (*Id.* at 165.) He admitted that Brion gave him a ride to Felicia Walker's house the night of the crime spree. (*Id.* at 165-66.) Elgie was also there. (*Id.* at 168.) Treadwell said that he went to visit a woman he knew, but she did not come to the door or answer his calls, so he went back to the Walker house at about 2:00 a.m.. (*Id.* at 168-70.) Elgie and Tone showed up at the house about an hour later and Tone had been hit by a car. (*Id.* at 170.) Treadwell testified that he stayed at the Walker house until the following morning. (*Id.* at 174.)

When Treadwell heard the police were looking for him, he decided to turn himself in.  (*Id.* at 176-78.)  He was taken into custody and to the precinct.  (*Id.* at 179.)  He testified that at the precinct, the officers had masks on and were being aggressive, telling him he was going to jail for the rest of his life.  (*Id.* at 180.)  Treadwell stated that the officers told him he needed to tell the interviewer something, or else it was going to be pinned on him.  (*Id.* at 181.)  He was not allowed to see his attorney until after the police coerced him into making a false statement.  (*Id.* at 182.)  He said that the interviewer made up what was in the statement because he never told her that he was present for the crime spree or that he jumped out with a gun.  (*Id.* at 182-84.)  Treadwell said the investigator promised him that if he made the statement she would let him go and he would not have to testify.  (*Id.* at 189-90.)

On cross-examination, Treadwell admitted that he signed each page of the statement to Inv. Simon and that Simon told him she wanted the truth.  (*Id.* at 194.)  Despite his signature on every page, he testified that he did not read the statement after it was completed.  (*Id.* at 196-97.)

19

### B.   Procedural History

Treadwell was convicted of first-degree premeditated murder, carjacking, two counts of armed robbery, assault with intent to murder, felon in possession of a firearm, and felony firearm.  The trial court sentenced him to life for the murder conviction, four terms of 23 years, 9 months-to-50 years for the carjacking, armed robbery, and assault convictions, 2-to-5 years for the felon-in-possession conviction, and a mandatory 2-year sentence for the felony-firearm conviction.

Following his conviction and sentence, Treadwell filed a claim of appeal in the Michigan Court of Appeals, which raised the following claims:

> I.   Appellant's convictions must be reversed and the charges dismissed, as the prosecution failed to present legally sufficient evidence that he was a principal or an aider and abettor in violation of his right to due process of law.
>
> II.   Appellant is entitled to a new trial where defense counsel provided constitutionally ineffective assistance by failing to move to sever unrelated offenses.
>
> III.   The Constitutional protection against double jeopardy involving multiple punishment for the same offense requires the court to modify the judgment of sentence to specify a single count for first-degree murder supported by two theories (premeditated and felony murder), and to vacate the separate sentence for

> assault with intent to rob while armed involving the same decedent.

The Michigan Court of Appeals vacated Treadwell's separate conviction of felony murder and ordered the trial court to correct the judgment of sentence to first-degree murder based on two theories. *People v. Treadwell*, No. 277363, 2008 WL 2744738, at *6 (Mich. Ct. App. Jul. 15, 2008). The court also vacated Treadwell's conviction of assault with intent to rob while armed as the predicate felony for felony murder and ordered the trial court to correct the judgment of sentence. *Id.* The state court of appeals affirmed Treadwell's remaining convictions in the unpublished opinion. *Id.* at *1, 6.

Treadwell subsequently filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claims as in the Michigan Court of Appeals, minus the double jeopardy claim. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Treadwell*, 759 N.W.2d 376 (Mich. 2009) (unpublished table decision).

Then he filed a petition for habeas relief in this Court, but at the same time he filed a motion for the Court to hold the petition in

abeyance so that he could exhaust his state-court remedies.  (R. 1, R. 3.)

This Court granted that motion, and ordered Treadwell to file his state-court pleading within sixty days of the date of the order and also to file a motion to reopen proceedings within sixty days of the Michigan Supreme Court decision.  (R. 5.)  Treadwell complied with both of these deadlines.

Meanwhile, Treadwell returned to the trial court and filed a motion for relief from judgment, which contained the following claims:

I.  Defendant was denied a fair trial due to ineffective assistance of counsel because his attorney failed to investigate and prepare for trial.

II.  Defendant was denied a fair trial because his attorney failed to call an exculpatory defense witness.

III.  Defendant was denied a fair trial because his attorney failed to seek an expert witness to testify as to false identification and false confessions.

The trial court denied the motion for relief from judgment because he failed to present his claims on direct review, thereby rendering them procedurally defaulted, Mich. Ct. R. 6.508(D)(3).  (10/12/10, Wayne County Cir. Ct. Opinion at 2.)   In the alternative, the trial court held the claims were meritless.  (*Id.* at 2-5.)

22

After the trial court denied the motion for relief from judgment, Treadwell filed an application for leave to appeal in the Michigan Court of Appeals.  The Michigan Court of Appeals denied the application for leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  (5/2/12, Mich. Ct. App. Order at 1.)

Treadwell applied for leave to appeal this decision in the Michigan Supreme Court, but was also denied relief under Michigan Court Rule 6.508(D).  *People v. Treadwell*, 821 N.W.2d 660 (Mich. 2012) (unpublished table decision).

## Standard of Review Pursuant to AEDPA

Congress mandated the standards of review in federal habeas

proceedings in 1996 in AEDPA and it "prevent[s] federal habeas

'retrials'" and ensures that state-court convictions are given effect to the

extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94

(2002).  AEDPA "drastically changed" the nature of habeas review.

*Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  "The limitations

imposed by AEDPA are several and significant."  *Rice v. White*, 660

F.3d. 242, 250 (6th Cir. 2011).[4]  The requirements of AEDPA "create an

---

[4] The Supreme Court has emphasized that federal courts must adhere to AEDPA's stringent and limiting standards, reversing no fewer than 21 appellate AEDPA decisions since 2010.  *See Metrish v. Lancaster*, 133 S. Ct. 1781 (2013); *Marshall v. Rodgers*, 133 S. Ct. 1446 (2013) (per curiam); *Johnson v. Williams*, 133 S. Ct. 1088 (2013); *Ryan v. Gonzales*, 133 S. Ct. 696 (2013); *Parker v. Matthews*, 132 S. Ct. 2148 (2012) (per curiam); *Coleman v. Johnson*, 132 S. Ct. 2060 (2012) (per curiam); *Howes v. Fields*, 132 S. Ct. 1181 (2012); *Hardy v. Cross*, 132 S. Ct. 490 (2011) (per curiam); *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (per curiam); *Cavazos v. Smith*, 132 S. Ct. 2 (2011) (per curiam); *Bobby v. Mitts*, 131 S. Ct. 1762 (2011) (per curiam); *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam); *Swarthout v. Cooke*, 131 S. Ct. 859 (2011) (per curiam); *Premo v. Moore*, 131 S. Ct. 733 (2011); *Harrington v. Richter*, 131 S. Ct. 770, 781 (2011); *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010); *Renico v. Lett*, 130 S. Ct. 1855 (2010); *Berghuis v. Smith*, 559 U.S. 314 (2010); *Thaler v. Haynes*, 559 U.S. 43 (2010) (per curiam); *Smith v. Spisak*, 558 U.S. 139 (2010); *McDaniel v. Brown*, 558 U.S. 120 (2010) (per curiam).

independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007). "Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). "A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Smith v. Phillips*, 455 U.S. 209, 221 (1982).

Congress has limited the availability of federal habeas corpus relief "with respect to any claim" the state courts "adjudicated on the merits." 28 U.S.C. § 2254(d). Habeas relief may not be granted to Treadwell under § 2254(d) unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

> Section 2254(d) reflects the view that habeas corpus is a "guard

against extreme malfunction in the state criminal justice systems, not a

25

substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Federal courts performing habeas review do not act as "super-appellate state courts." *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002). "The federal habeas court does not act as an additional state appellate court to review a state court's interpretation of its own law or procedure." *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). A federal court's "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

AEDPA restricts the body of law a habeas court may consider. By its terms AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Because "[s]tate courts are not bound by the dictates of the lower federal courts," "a lower federal court's application of Supreme Court precedent is not inherently any more 'right' or 'correct' than that of state courts." *Evans v. Thompson*, 518 F.3d 1, 8 (1st Cir. 2008). "It is the Supreme Court, and the Supreme Court alone, that has the 'revising authority' to 'control [the state courts'] jarring and discordant judgments, and harmonize

them into uniformity.'"  *Id.* at 8 n.3 (quoting *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 348 (1816)); *Thayer v. Haynes*, 559 U.S. 43, 49 (2010) ("[W]e hold that no decision of this Court clearly establishes the categorical rule on which the Court of Appeals appears to have relied."). Thus, under AEDPA, if there is no "clearly established Federal law, as determined by the Supreme Court" that supports a habeas petitioner's legal argument, the argument must fail.  28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

As the Supreme Court explained in *Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), "clearly established Federal law" referred to in § 2254(d)(1) includes Supreme Court decisions at the time of the state-court adjudication on the merits but does not include Supreme Court decisions issued after the state court merits decision but before the petitioner's conviction becomes final.  This is so because the purpose of federal collateral review is to uphold final state court judgments that were valid when entered, not as a "mechanism for the continuing reexamination of final judgments."  *Sawyer v. Smith*, 497 U.S. 227, 234 (1990).

27

The only federal law that can be clearly established under §

2254(d) is Supreme Court precedent interpreting the Constitution.

*Early v. Packer*, 537 U.S. 3, 10 (2002).  Indeed, Supreme Court decisions

not based on constitutional grounds, e.g., decisions based on the Court's

supervisory powers, are "off the table as far as § 2254(d) is concerned."

*Id.*  Moreover, "[c]learly established law" under 28 U.S.C. § 2254(d)(1) is

"the *holdings*, as opposed to the dicta, of this Court's decisions."

*Metrish v. Lancaster*, 133 S. Ct. 1781, 1792 (2013) (quoting *Taylor*, 529

U.S. at 412 (2000)).  And merely distinguishing Supreme Court

precedent is insufficient to establish the entitlement to habeas relief.

*Lancaster*, 133 S. Ct. at 1792.

With respect to § 2254(d)(1), a state court decision is "contrary to"

federal law only "if the state court arrives at a conclusion opposite to

that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court has on a set of

materially indistinguishable facts." *Taylor*, 529 U.S. at 412-13.  A state

court decision "involves an unreasonable application of clearly

established Federal law" pursuant to § 2254(d)(1) if "'the state court

identifies the correct governing legal principle from [the Supreme]

Court decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Taylor*, 529 U.S. at 413).

It is well-settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas review." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Further, "'[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Visciotti*, 537 U.S. at 24-25). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A federal habeas court "fails to give proper deference to state courts by conflating error (even

29

clear error) with unreasonableness." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Deference must be given even in cases "where the state court's reasoning is flawed or abbreviated." *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009). In habeas review, the federal courts look at the "result that the state court reached, not 'whether [its decision] [was] well reasoned.'" *Robinson v. Polk*, 438 F.3d 350, 358 (4th Cir. 2006) (quoting *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003)).

Moreover, "[u]nder *Johnson v. Williams* and *Richter*, it is clear that a bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine. A state court could write that it rejected a defendant's claim because Tarot cards dictated that result, but its decision might nonetheless be a sound one. If a state court's rationale does not pass muster . . . , the only consequence is that further inquiry is necessary." *Brady v. Pfister*, 711 F.3d 818, 827 (7th Cir. 2013).

Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is

30

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Richter*, 131 S. Ct. at 786. Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87; *accord Lancaster*, 133 S. Ct. at 1786-87.

The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786. Furthermore, the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 785-86 (quoting *Yarborough*, 541 U.S. at 664). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 131 S. Ct. at 786.

When a federal claim has been presented to a state court, and the state court denies relief, a rebuttable presumption arises that the state court adjudicated the federal claim on its merits, irrespective of whether the court explicitly discusses the federal claim. *Johnson v. Williams*, 133 S. Ct. 1088, 1094-98 (2013). Indeed, it is the result to which deference is owed, not the opinion expounding it. As explained in *Rashad v. Walsh*, 300 F.3d 27, 45 (1st Cir. 2002), "[i]t is not our function . . . to grade a state court opinion as if it were a law school examination." Even if "the state court clearly applied an incorrect standard," then we must nonetheless decide whether "it reached the correct outcome." *West v. Bell*, 550 F.3d 542, 554 (6th Cir. 2008). A federal habeas court ultimately "review[s] for reasonableness the state court's ultimate decision, not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001).

The Supreme Court has also consistently drawn a distinction between state court decisions applying a broad constitutional standard and those that apply a narrow rule. As explained in *Yarborough v. Alvarado*, where a general standard is at issue, state court decisions are given greater leeway:

> If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough*, 541 U.S. at 664; *accord Renico v. Lett*, 130 S. Ct. 1855, 1864 (2010). Open-ended standards give states wide berth on habeas review. *Richter*, 131 S. Ct. at 786. Thus, in *Knowles v. Mirzayance*, 556 U.S. 111, 114 (2009), the Court held that ineffective-assistance-of-counsel claims must be given extra latitude in light of the general nature of the rule: "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

Furthermore, with respect to § 2254(d)(2), a determination of a factual issue made by the state courts shall be presumed correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74. Facts found by a state appellate court enjoy the same presumption. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). Where a state court's factual findings are

33

not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." *Campbell v. Vaughn*, 209 F.3d 280, 289 (3d Cir. 2000) ("[A]n implicit finding of fact is tantamount to an express one, such that deference is due to either determination." *Id.* at 286 (citing *Parke v. Raley*, 506 U.S. 20, 35 (1992))). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id.* (citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1982)).

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *Rice v. Collins*, 546 U.S. 333, 339 (2006) (noting that even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination"). And, as explained in *Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir. 2007), a state court's resolution of an issue in Treadwell's favor is not entitled to deference under AEDPA

34

because the "standard of review is a precondition to the grant of habeas relief . . . not an entitlement to it."

Lastly, the Supreme Court has held that "review under § 2254(d)(1) focuses on what a state court knew and did."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011).  Therefore, review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 1398.

If the state court adjudicated any of Treadwell's claim on the merits, this Court must deny any attempt by him to supplement the state court record, whether through an evidentiary hearing, discovery, or the presentation of new evidence in light of United States Supreme Court precedent.  *Pinholster*, 131 S. Ct. 1388 (2011); *accord Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013) ("While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* preclude it.").

If any of Treadwell's claims were procedurally defaulted or otherwise not adjudicated on the merits, he has not demonstrated entitlement to a federal evidentiary hearing because the petition may

be denied based on the existing record.  28 U.S.C. § 2254(e)(2);

*Pinholster*, 131 S. Ct. at 1398 (holding that "review under § 2254(d)(1) is

limited to the record that was before the state court that adjudicated

the claim on the merits").  In *Schriro v. Landrigan*, 550 U.S. 465, 474

(2007), the United States Supreme Court held that "[b]ecause the

deferential standards prescribed by § 2254 control whether to grant

habeas relief, a federal court must take into account those standards in

deciding whether an evidentiary hearing is appropriate."  The Court

held that "[i]t follows that if the record refutes the applicant's factual

allegations or otherwise precludes habeas relief, a district court is not

required to hold an evidentiary hearing."  *Id.*

Argument

**I.      Treadwell's claim that there was insufficient evidence to support his convictions is meritless.  The state court's determination that there was ample evidence presented was not objectively unreasonable.**

In his first habeas claim, Treadwell argues that there was insufficient evidence presented to support all of his convictions. Specifically, he suggests that other than his statement to the police (which he denied making) and general descriptions from the victims that one of the perpetrators had his body type, there was no evidence that he aided and abetted the crimes, let alone that he was even there that night.  Treadwell is not entitled to relief because the claim is meritless when viewed under AEDPA's doubly-deferential standard.

**A.      Standard by which sufficiency claims are analyzed on habeas review is doubly deferential.**

Clearly established Supreme Court law holds that the Due Process Clause protects a criminal defendant from being convicted of a crime without proof beyond a reasonable doubt of every element of an offense.  *In re Winship*, 397 U.S. 358, 361 (1970).  With respect to sufficiency claims, the Supreme Court in *Jackson v. Virginia*, 443 U.S.

37

307, 318-19 (1979), held that the critical inquiry on sufficiency claims must determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The inquiry is not whether the reviewing court itself believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Thus, under *Jackson*, a habeas petitioner is entitled to relief on a sufficiency claim "if it is found that upon the record evidence adduced at the trial that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.

The Supreme Court emphasized that all of the evidence is to be considered in the light most favorable to the prosecution. *Id.* at 319. This standard was to be applied whether the evidence of guilt was direct or circumstantial. Circumstantial evidence is entitled to equal weight as direct evidence, and the prosecution may meet its burden entirely through circumstantial evidence. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003).

Moreover, in *Jackson* the Supreme Court stated that prosecutor did not have an affirmative duty to rule out every hypothesis except that of guilt. *Jackson*, 443 U.S. at 326. It is the province of the fact-finder—in Treadwell's case, the jury—to weigh the probative value of the evidence and resolve any conflicts in testimony. *Id.* at 318-319. And "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not appear affirmatively in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Federal habeas courts reviewing sufficiency claims are cautioned not to reweigh the evidence or redetermine the credibility of witnesses whose demeanor had been observed by the finder of fact. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

The scope of review on habeas review of the sufficiency of evidence was extremely limited, even before the enactment of AEDPA. 28 U.S.C. § 2254(d) created additional limits on a federal habeas court's review. In reviewing a sufficiency claim, deference is now required at two levels: first, to the jury's verdict as contemplated by *Jackson*, and second, to

the state court's consideration of the jury's verdict as dictated by AEDPA. *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

To determine whether a state court's application of clearly established law was unreasonable, the Supreme Court has stated, as noted above, that "the range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough*, 541 U.S. at 664. The standard for sufficiency claims constitutes a general rule which requires the federal courts to allow the states more leeway in its application. *Id.* at 663-64.

### B. Treadwell has not met AEDPA's stringent standard because ample evidence was presented to support his convictions.

Following Treadwell's direct appeal, his remaining convictions were for the following crimes: first-degree premeditated murder (Off. Charles Phipps), carjacking (John Feazell), two counts of armed robbery (John Feazell and Marie Leinonen), assault with intent to murder (Marie Leinonen), felon in possession of a firearm, and felony firearm. Ample evidence was presented to support the jury's finding that Treadwell was guilty of those crimes or that he aided and abetted in

40

their commission.  His disagreement with the verdict is not enough to overturn his convictions.

The Michigan Court of Appeals rejected each claim of insufficient evidence on direct review by applying the correct constitutional standard:

> First, defendant argues that the prosecution failed to present legally sufficient evidence to support his convictions. We review sufficiency of the evidence claims de novo. *People v Lueth*, 253 Mich App 670, 680; 60 NW2d 322 (2002).  We "view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999) (internal quotations omitted).  Circumstantial evidence and reasonable inferences arising from that evidence may be satisfactory proof of the elements of a crime. *People v Lee*, 243 Mich App 163, 167-168; 622 NW2d 71 (2000).

*Treadwell*, 2008 WL 2744738, at *1.  Not only did the state appellate court apply the correct constitutional standard for reviewing sufficiency-of-the-evidence claims, but it did so in a manner that was not objectively unreasonable with respect to each conviction.

1.    **Sufficient evidence was presented that Treadwell was actively involved in the first-degree murder of Off. Charles Phipps.**

The Michigan Court of Appeals held that evidence was presented that would allow a reasonable jury to convict Treadwell of first-degree murder under an aiding and abetting theory:

> Defendant contends that the prosecution failed to present legally sufficient evidence to support his first-degree premeditated murder conviction. We disagree. "The elements of first-degree murder are that the defendant killed the victim and that the killing was ... 'willful, deliberate, and premeditated....'" *People v. Bowman,* 254 Mich. App. 142, 151, 656 N.W.2d 835 (2002). First-degree murder may be established if the defendant had the specific intent to kill. *People v. Graham,* 219 Mich. App. 707, 710-711, 558 N.W.2d 2 (1996). To show premeditation and deliberation, "'[s]ome time span between [the] initial homicidal intent and ultimate action is necessary....'" *People v. Gonzalez,* 468 Mich. 636, 641, 664 N.W.2d 159 (2003), quoting *People v. Tilley,* 405 Mich. 38, 45, 273 N.W.2d 471 (1979) (internal citations omitted). "The interval between the initial thought and ultimate action should be long enough to afford a reasonable person time to take a 'second look.'" *Id.*
>
> Defendant was convicted of first-degree murder under an aiding and abetting theory. "[T]o convict a defendant of aiding and abetting a crime, a prosecutor must establish that '(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.'" *People v. Moore,* 470 Mich. 56, 67-68, 679

42

N.W.2d 41 (2004), quoting *People v. Carines,* 460 Mich. 750, 768, 597 N.W.2d 130 (1999).

A reasonable jury could have found that defendant aided in Phipps' murder. Defendant admitted that he, McConnell, Grays, and Currie carried guns on the night of the shooting. They participated in robberies and attempted robberies within an hour and a few blocks away from Joy Road, where Phipps was found dead. Admittedly, no witnesses observed Phipps' shooting and defendant's gun was not recovered or connected to the bullets that killed Phipps. Regardless, even if defendant was not the shooter, there was evidence that his acts encouraged and assisted the shooting. Defendant told Investigator Barbara Simon that Grays was the first person to shoot at Phipps' minivan. However, when Phipps began to run away, defendant encouraged and assisted Grays by also shooting at Phipps. Defendant's knowledge of Grays's intent can be inferred from the assistance he provided Grays. Therefore, there was sufficient evidence to convict defendant of first-degree premeditated murder under an aider and abettor theory.

*Treadwell*, 2008 WL 2744738, at *1-2. This determination was not objectively unreasonable.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate. *People v. Kelly*, 588 N.W.2d 480, 488 (Mich. 1998); Mich. Comp. Laws § 750.316. Premeditation and deliberation may be established by evidence of "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's

43

conduct after the homicide." *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. 1992). "Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of the crime," *People v. Jolly*, 502 N.W.2d 177, 180 (Mich. 1993), including a defendant's intent or state of mind. *People v. Dumas*, 563 N.W.2d 31, 34 (Mich. 1997). Use of a lethal weapon supports an inference of an intent to kill. *People v. Turner*, 233 N.W.2d 617, 619 (Mich. 1975).

Also, as correctly noted by the Michigan Court of Appeals, in order to convict a defendant under an aiding and abetting theory, the prosecutor must establish the following: (1) the underlying crime must be committed by the defendant or another person; (2) the defendant must perform acts or give encouragement that aids and assists commission of the crime; and (3) the defendant must intend commission of the crime or know the principal intends its commission at the time of giving aid or encouragement. *Treadwell*, 2008 WL 2744738, at *2 (citing *People v. Moore,* 470 Mich. 56, 67-68, 679 N.W.2d 41 (2004)); (2/1/07, Trial Tr. at 86-87.). Mere presence, however, even with knowledge of the offense, is insufficient. *Sanford v. Yukins*, 288 F.3d 855, 858 (6th Cir. 2002); (2/1/07, Trial Tr. at 95.).

Here, there was evidence of Treadwell's identity as a participant, intent to kill, and premeditation before the murder.

The prosecution presented a statement by Treadwell himself where he places himself at the scene of Off. Phipps' murder (and every other crime he and his friends committed that night). (1/31/07, Trial Tr. at 116-22.) In his statement to police, Treadwell admits to being with Brion McConnell, Elgie Grays, and David Currie at the scenes of the crimes and to firing his gun at Off. Phipps. (*Id.* at 117-19.) Specifically, he said that when the four men approached Phipps' minivan, Grays got out of the car and started shooting. (*Id.* at 117.) Then Treadwell and the others got out of the car, involving themselves further. (*Id.*) Treadwell stated that he noticed Off. Phipps "reach" for something, and that's when Grays started shooting again. (*Id.*) Phipps tried to run from the gun fire, but the other men—Treadwell included—started firing. (*Id.*)

Treadwell's statement allows a rational jury to infer from his actions that (1) he was an active participant, (2) he encouraged a continued assault on Off. Phipps by firing his gun, and (3) he did so all the while taking the time to watch Off. Phipps react to the assault. As

45

previously noted, if a lethal weapon is used, it supports an inference of the defendant's intent to kill. *Turner*, 233 N.W.2d at 619. Moreover, Treadwell admitted that he did not start shooting his own gun until after Off. Phipps started running from the gun shots. He had plenty of time to contemplate his actions and take a "second look" at what he was doing. *Treadwell*, 2008 WL 2744738, at *1; (1/31/07, Trial Tr. at 117-19.).

In reviewing the record evidence in a light most favorable to the prosecution, the prosecutor presented evidence that would allow a rational jury to determine that there was sufficient evidence to support Treadwell's conviction of first-degree premeditated murder. And the state court of appeals' affirmance of that decision was not objectively unreasonable. This portion of Habeas Claim I should be denied.

> **2.  Sufficient evidence was presented that Treadwell was actively involved in the carjacking and armed robberies of John Feazell and Marie Leinonen.**

The Michigan Court of Appeals held that evidence was presented that would allow a reasonable jury to convict Treadwell of carjacking

46

and armed robbery of John Feazell and Marie Leinonen under an aiding

and abetting theory:

> Defendant contends that the prosecution failed to present legally sufficient evidence to convict him of carjacking. We disagree. To convict a defendant of carjacking, the prosecution must prove that the defendant, by force or violence, by threat of force or violence, or by putting in fear, took a motor vehicle in the presence of the lawful possessor of it. *People v. Davis,* 468 Mich. 77, 80 n. 2, 658 N.W.2d 800 (2003). In this case, Feazell testified that defendant and several other men pointed their guns at him, forced him from his vehicle, stole his gold chain and cellular phone, hit him in the head and stole his vehicle. Even if defendant did not drive Feazell's vehicle away, defendant's knowledge of the driver's intent to do so can be inferred from his assistance in forcing Feazell from the vehicle. Consequently, the prosecution presented sufficient evidence to convict defendant of carjacking.

* * *

> Defendant contends that the prosecution failed to present legally sufficient evidence to convict him of the armed robbery of Feazell and Leinonen. We disagree. The elements of armed robbery are "'(1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute.'" *People v. Ford,* 262 Mich. App. 443, 458, 687 N.W.2d 119 (2004), citing *Carines, supra* at 757, 597 N.W.2d 130. Both Feazell and Leinonen identified defendant as one of the men in the Honda CRV who approached them armed with guns. After the men stole Feazell's gold chain and cellular telephone, defendant threatened to shoot Feazell and hit him in the head with his gun. Darryl Fulks saw defendant with a gold chain after the robbery. Leinonen testified that defendant hit her in the head with a gun and stole her purse. The men also shot at

47

Leinonen's vehicle as she escaped.  Defendant's statement to Investigator Simon that "Only one person got robbed.... We attempted to rob other people, but they got away," sufficiently demonstrates defendant's intent to permanently deprive Feazell and Leinonen of their property.  Therefore, sufficient evidence existed to convict defendant of these armed robberies.

*Treadwell*, 2008 WL 2744738, at *3.  These determinations were not objectively unreasonable.

The elements of carjacking are (1) the defendant took a motor vehicle from another person; (2) the defendant did so in the presence of that person, a passenger, or any other person in lawful possession of the motor vehicle, (3) the defendant did so either by force or violence, by threat of force or violence, or by potting the other person in fear.  Mich. Comp. Laws § 750.529a(1); *People v. Davenport*, 593 N.W.2d 919, 920-21 (Mich. App. 1998).

The elements of armed robbery are (1) an assault; (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon.  Mich. Comp. Laws § 750.529; *People v. Smith*, 733 N.W.2d 351, 365 (Mich. 2007).

Again, the trial court instructed the jury that Treadwell was being charged under an aiding and abetting theory for these crimes. (2/1/07, Trial Tr. at 86-87, 95.)

Regarding Feazell, the Michigan Court of Appeals noted that he testified that a group of four armed men—one of which was Treadwell—forced him out of his car, took his gold necklace and cell phone, bashed him in the head, and then drove away in his car. (1/30/07, Trial Tr. at 76-84.) A jury could reasonably infer from this testimony that when Treadwell removed Feazell from his car, bashed him in the head, and threatened to shoot him, that he was an active participant in both the robbery and the carjacking. *Treadwell*, 2008 WL 2744738, at *3; (1/30/07, Trial Tr. at 76-84.). That Treadwell did not personally drive the car away does not affect this determination because he assisted in removing Feazell from the car in the first place. (1/30/07, Trial Tr. at 73, 76.)

Also, Treadwell himself admitted to police that he and his three friends robbed one person and attempted to rob others "but they got away." (1/31/07, Trial Tr. at 119.) The court of appeals aptly held that this admission demonstrated Treadwell's "intent to permanently

49

deprive Feazell . . . of [his] property." *Treadwell*, 2008 WL 2744738, at *3.

Similarly, Leinonen testified that four African American men got out of an SUV with guns and yelled "Police police." (1/30/07, Trial Tr. at 126.) One of the men fired a shot at her as she tried to back up and told her open the door. (*Id.* at 126-27.) When she opened the door, she was bashed in the head by the short man and her purse was taken. (*Id.* at 127-28.) The short man who bashed her in the head was the same height as Treadwell. (*Id.* at 128.) Because Feazell testified that Treadwell bashed him in the head, a jury could logically infer that Treadwell was the person who bashed Leinonen in the head when the foursome robbed her as well. So, while Leinonen did not specifically identify Treadwell as the person who hit her and took her purse, a jury could reasonably determine it was him or that he aided and abetted in the crime. *Treadwell*, 2008 WL 2744738, at *3.

Just as with Feazell, Treadwell's incriminating statement that him and his friends "attempted to rob other people, but they got away," demonstrated Treadwell's "intent to permanently deprive. . . Leinonen .

. . of [her] property." *Treadwell*, 2008 WL 2744738, at \*3; (1/31/07, Trial

Tr. at 119.).

In light of the record, the state appellate court, "after reviewing

the evidence in the light most favorable to the prosecution," reasonably

determined that there was sufficient evidence to support Treadwell's

carjacking and robbery convictions as they relate to Feazell and

Leinonen. *Jackson*, 443 U.S. at 318-19. He is not entitled to relief on

this portion of Habeas Claim I.

### 3. Sufficient evidence was presented that Treadwell was actively involved in the assault with intent to murder Marie Leinonen.

The Michigan Court of Appeals held that evidence was presented

that would allow a reasonable jury to convict Treadwell of assault with

intent to murder Marie Leinonen under an aiding and abetting theory:

> Defendant contends that the prosecution failed to
> present legally sufficient evidence to convict him of assault
> with intent to murder Leinonen. We disagree. The elements
> of assault with intent to murder are "(1) an assault, (2) with
> an actual intent to kill, (3) which, if successful, would make
> the killing murder." *People v. Brown,* 267 Mich. App. 141,
> 147-148, 703 N.W.2d 230 (2005) (internal quotations
> omitted). Leinonen testified that she initially attempted to
> escape from the men in the CRV. However, when she
> backed away, one of the men shot at her vehicle. After she
> was robbed, Leinonen ducked and drove away while the men

51

shot at her vehicle and broke her windows. Officer David Pauch explained that evidence from more than one gun was recovered at the scene of this robbery. Although it is unclear who shot at Leinonen's vehicle, defendant's acts encouraged and assisted the shooting. Defendant stole Leinonen's purse and hit her after the initial shooting. Therefore, a reasonable juror could infer that defendant was aware of the shooter's intent to shoot at Leinonen if she attempted to escape. Thus, there was sufficient evidence to convict defendant of assault with intent to murder Leinonen as an aider and abettor.

*Treadwell*, 2008 WL 2744738, at *4. This determination was not objectively unreasonable.

The elements of assault with intent to commit murder are "'(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'" *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (quoting *People v. Plummer*, 581 N.W.2d 753, 759 (Mich. Ct. App. 1998)). The second element, "[t]he specific intent to kill 'may be proven by inference from any facts in evidence.'" *Warren*, 161 F.3d at 361 (quoting *People v. Hoffman*, 570 N.W.2d 146, 150 (Mich. Ct. App. 1997)). The intent to kill is an actual element and may be shown by the surrounding circumstances and inferences from conduct. *People v. Taylor*, 375 N.W.2d 1, 3 (Mich. 1985). Similar to first-degree premeditated murder, as discussed above, intent to kill with respect to

52

assault with the intent to kill may be inferred from the use of a dangerous weapon. *Turner*, 233 N.W.2d at 619.

Here, Leinonen testified that four African American men got out of an SUV with guns and one of the men fired a shot at her as she tried to back up. (1/30/07, Trial Tr. at 126-27.) When she opened the door, she was bashed in the head by the short man who was the same height as Treadwell. (*Id.* at 127-28.) When Leinonen drove away "like a maniac," the men fired shots at her car, causing her windows to blow out and bullet holes in her car. (*Id.* at 127-33.)

While Leinonen did not specifically identify Treadwell as a person who fired his weapon at her, she testified that he was there with a gun and that multiple shots were fired at her car as she tried to get away. (*Id.* at 127-33, 136-37, 139-40.) Based on this evidence, a jury could reasonably determine that the bullets fired at Leinonen came from either Treadwell's gun, or one of his friends' guns. Also, a jury could reasonably infer that Treadwell was "aware of the shooter's intent" to fire at her if she tried to escape. *Treadwell*, 2008 WL 2744738, at *4.

Further, Treadwell admitted that he was wielding a gun as he and his friends attempted to rob several people and that he was would fire

53

it. (1/31/07, Trial Tr. at 117-18); *Turner*, 233 N.W.2d at 619 (Intent to kill may be inferred from the use of a dangerous weapon). Because Treadwell conceded that he would fire his gun, the jury could infer that he either did fire his gun at Leinonen or encouraged the others to do so.

In light of the record, the state appellate court, "after reviewing the evidence in the light most favorable to the prosecution," reasonably determined that there was sufficient evidence to support Treadwell's conviction of assault with intent to murder Leinonen. *Jackson*, 443 U.S. at 318-19. He is not entitled to relief on this portion of Habeas Claim I.

> **4. Sufficient evidence was presented that Treadwell was a felon in possession of a firearm and that he possessed a firearm during the commission of a felony.**

The Michigan Court of Appeals held that evidence was presented that would allow a reasonable jury to convict Treadwell of two weapons charges: (1) felon in possession of a firearm and (2) possession of a firearm during the commission of a felony:

> Finally, defendant contends that the prosecution failed to present legally sufficient evidence to convict him of either weapons offense. We disagree. Defendant bases his claim on his assertion that the prosecution presented insufficient

evidence to convict him of the murder, carjacking, and assault charges.  Because we concluded that the prosecution presented sufficient evidence to support these convictions, we conclude that defendant's assertions that the prosecution presented insufficient evidence to establish his weapons convictions lack merit.

*Treadwell*, 2008 WL 2744738, at *4.  These determinations were not objectively unreasonable.

Sufficient evidence to support Treadwell's conviction of both weapons charges was presented at trial.

First, regarding felon in possession of a firearm, the prosecutor must establish (1) a previous felony conviction, (2) that the defendant possessed a firearm, and (3) that at the time of possession, less than three or five years, depending on the underlying felony, has passed since the defendant had completed his term of incarceration, satisfied all conditions of probation and parole, and paid all fines.  *Parker v. Renico*, 506 F. 3d 444, 448 (6th Cir. 2007).

Here, the first element—a prior felony—was established through a stipulation by the prosecutor and defense counsel.  (2/1/07, Trial Tr. at 94.)  Also, Treadwell admitted in his statement to police that he possessed a firearm during the crimes; he said he had a "38." (1/31/07, Trial Tr. at 118.)  He further admitted to his active participation in

55

those crimes. (*Id.* at 116-22.) Additionally, two of the victims identified Treadwell as one of the perpetrators. *Treadwell*, 2008 WL 2744738, at *3. Sufficient evidence was presented to convict of felon in possession of a firearm.

Second, regarding felony-firearm, the prosecutor must establish that the defendant possessed a firearm while committing, or while attempting to commit, a felony offense. *Id.*

Again, Treadwell admitted he possessed a firearm during the crimes and that he was an active participant. (1/31/07, Trial Tr. at 116-22.) If that was not enough, John Feazell and Marie Leinonen identified Treadwell as one of the perpetrators. *Treadwell*, 2008 WL 2744738, at *3. Sufficient evidence was presented here as well.

In light of the record, the state appellate court, "after reviewing the evidence in the light most favorable to the prosecution," reasonably determined that there was sufficient evidence to support Treadwell's conviction of felon in possession of a firearm and possession of a firearm during the commission of a felony. *Jackson*, 443 U.S. at 318-19. He is not entitled to relief on this portion of Habeas Claim I.

**II.  To show ineffective assistance of counsel, a habeas
petitioner must show deficient performance and
prejudice.  Where Treadwell has failed to satisfy either
prong, habeas relief is not warranted.**

In his remaining claims, Treadwell argues that he was denied the

effective assistance of trial counsel.  In Claim II, he argues that his

counsel was ineffective for failing to move to sever the charges because

the offenses were unrelated.  This claim is meritless because the

offenses were, in fact, related.

In Claims III and IV, Treadwell argues that his counsel failed to

investigate and call an exculpatory witness.  In Claim V, he argues that

his counsel was ineffective for failing to call an expert on false

identifications and false confessions.  Because Treadwell failed to

present Claims III-V on direct appeal, the claims are procedurally

defaulted and he has presented no argument to excuse that default.  In

the alternative, the claims are meritless.

**A.  Standard of review for claims of ineffective assistance
of counsel is highly deferential to state courts.**

Claims of ineffective assistance of counsel are governed by the law

set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).

Under *Strickland*, a petitioner must establish that his counsel's performance was deficient *and* that he was prejudiced by his counsel's deficient performance. *Id.* at 687-688 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697). Regarding the performance prong, judicial scrutiny of counsel's performance must be "highly deferential" and a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Beyond the general requirement of reasonableness, "specific guidelines are not appropriate." *Id.* at 688. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . ." *Id.* at 688-689 (It is rare that constitutionally competent representation will require any one technique or approach. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (citing *Harrington v. Richter,* 131 S. Ct. 770, 789 (2011))). The Supreme Court has said that there "are countless ways to provide effective assistance in any given

case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

Regarding the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Notably, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

The Supreme Court has said that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). In other words, "under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 131 S. Ct. at 788. In a habeas case such as this one, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As noted above, for purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Williams v. Taylor*, 529 U.S. 362, 410 (2000). The question is not whether a federal court believes the State court's determination under

*Strickland* was incorrect but whether it was unreasonable—a substantially higher threshold. *Knowles v. Mirzayance,* 129 S. Ct. 1411, 1420 (2009) (internal quotations omitted).  On habeas review, a State court "must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 131 S. Ct. at 785.  And "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Id.* at 786 (When § 2254(d) applies, the question is not whether counsel's actions were reasonable—the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.  *Richter*, 131 S. Ct. at 788).

Moreover, because the *Strickland* standard is a general standard, a State court "has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 129 S. Ct. at 1420; *Renico v. Lett*, 130 S. Ct. 1855, 1864 (2010); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

According to the Supreme Court, "[t]he standards created by *Strickland* and § 2254 are both 'highly deferential,'" and "when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (quoting *Strickland*, 466 U.S. at 689); *Richter*, 131 S. Ct. at 788 (quoting *Knowles*, 129 S. Ct. at 1413).

> **B.** **Treadwell's claim that his counsel was ineffective for failing to move to sever the charges is meritless because the charges were, in fact, related. As a result, severance was improper and counsel was not ineffective for failing to request it.**

On direct review to the Michigan Court of Appeals, Treadwell argued that his counsel should have sought severance of the charges. The state court of appeals reasonably rejected this claim—using the correct constitutional standard—because the offenses here were all committed in a 35-minute time frame, with similar facts, and in a similar geographic location:

> Next, defendant argues that his attorney was ineffective because he failed to move to sever these offenses, which involved separate victims and circumstances. We disagree. Our review of a claim of ineffective assistance of counsel is limited to mistakes apparent on the record. *People v. Rodriguez,* 251 Mich. App. 10, 38, 650 N.W.2d 96 (2002). The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v.*

*Grant,* 470 Mich. 477, 484, 684 N.W.2d 686 (2004). "A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *Id.* We review the trial court's factual findings for clear error and its constitutional determinations de novo. *Id.* at 484-485, 684 N.W.2d 686.

Effective assistance is strongly presumed and the reviewing court should not evaluate an attorney's decision with the benefit of hindsight. *Id.* at 485, 684 N.W.2d 686; *People v. Toma,* 462 Mich. 281, 302, 613 N.W.2d 694 (2000). To demonstrate ineffective assistance, a defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that this performance so prejudiced him that he was deprived of a fair trial. *Grant, supra* at 485-486, 684 N.W.2d 686. Prejudice exists if a defendant shows a reasonable probability that the outcome would have been different but for his attorney's errors. *Id.* at 486, 684 N.W.2d 686.

A criminal defendant is entitled to separate trials on unrelated offenses pursuant to MCR 6.120(B). *People v. Daughenbaugh,* 193 Mich. App. 506, 509, 484 N.W.2d 690 (1992), mod 441 Mich. 867, 490 N.W.2d 886 (1992). "Joinder is appropriate if the offenses are related." MCR 6.120(B)(1). "Offenses are related if they are based on the same conduct or transaction, a series of connected acts, or a series of acts constituting parts of a single scheme or plan. *Id.* This Court has noted,

> "'[S]ame conduct' refers to multiple offenses 'as where a defendant causes more than one death by reckless operation of a vehicle.' 'A series of acts connected together' refers to multiple offenses committed 'to aid in accomplishing another, as with burglary and larceny or kidnapping and robbery.' 'A series of acts ... constituting parts of a single scheme or plan' refers to a situation 'where

> a cashier made a series of false entries and reports to the commissioner of banking, all of which were designed to conceal his thefts of money from the bank.'" [*Daughenbaugh, supra* at 509-510, 484 N.W.2d 690, quoting *People v. Tobey,* 401 Mich. 141, 151-152, 257 N.W.2d 537 (1977).]
>
> Joinder is also appropriate for offenses within a close time-space sequence, such as offenses occurring within an hour and a half and having arisen from substantially the same transaction. *Id.* at 510, 484 N.W.2d 690.
>
> In this case, the offenses against Feazell, Smith, Leinonen, Phipps, Andrews, and Wellborn occurred between 3:00 a.m. and 3:35 a.m. on April 28, 2006. Furthermore, the offenses each occurred within several blocks on the west side of Detroit. In each offense, the assailants drove a vehicle resembling a gray Honda CRV and targeted motorists. Feazell, Smith, and Leinonen testified that their assailants pretended to be police officers, carried guns and hit them in the head. The motorists also described the assailants' physiques similarly. Finally, defendant admitted that he robbed one person and attempted to rob others during those early-morning hours. Therefore, because these offenses occurred within a close time-space sequence, they arose out of substantially similar transactions, and because joinder was in the interest of judicial economy, the offenses were properly joined. Consequently, a motion to sever would have been futile, and therefore defense counsel's failure to make such a motion was not ineffective. *People v. Ackerman,* 257 Mich.App. 434, 455, 669 N.W.2d 818 (2003) ("[C]ounsel does not render infective assistance by failing to raise futile objections.").

*Treadwell*, 2008 WL 2744738, at *4-5. This determination was not

objectively unreasonable.

Under Michigan law, joinder is permissible when offenses are related. Meaning they are based on "the same conduct or transaction," "a series of connected acts," or "a series of acts constituting parts of a single scheme or plan." *Treadwell*, 2008 WL 2744738, at *5 (citing Mich. Ct. R. 6.120(B)(1)(a)-(c)). Joinder is also appropriate when the offenses occur in a short time-frame and arise from the same transaction. *Treadwell*, 2008 WL 2744738, at *5 (citing *people v. Daughenbaugh*, 484 N.W.2d 690, 691 (1992)).

Here, all of Treadwell's charged offenses occurred between 3:00 a.m. and 3:35 a.m. on April 28, 2006, on the west side of Detroit. *Treadwell*, 2008 WL 2744738, at *5; (1/30/07, Trial Tr. at 71, 110, 125.). The four assailants would stop cars, brandish guns, and claim they were the "police." *Treadwell*, 2008 WL 2744738, at *5; (1/30/07, Trial Tr. at 73, 111-12, 126.) They would then attempt to rob, or succeed in robbing, the drivers of those cars. (1/30/07, Trial Tr. at 76-81, 127-28.)

In addition to the similarities of the crimes on the record, Treadwell himself admitted to police that he and his friends either robbed or attempted to rob several people on April 28, 2006. (1/31/07, Trial Tr. at 119.) He also admitted to firing his gun at DPD Off.

Charles Phipps when Phipps attempted to run from Treadwell and his friends. (*Id.* at 117.)

Because the offenses here were all related under Michigan law, any attempt by defense counsel to sever the charges would have been futile. Counsel cannot be deemed ineffective for failing to raise futile objections. *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

Futility aside, the State submits that neither *Strickland* prong has been established. Treadwell has not shown his counsel performed deficiently. Trial counsel may have believed that joinder of the charges could benefit Treadwell because the prosecutor would have only one chance for conviction instead of multiple chances. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002). Giving the prosecutor only one chance to go after a defendant— instead of several—is a strategic choice within the wide range of reasonable professional decisions. *Strickland*, 466 U.S. at 689.

Treadwell also cannot show that he was prejudiced by counsel's decision not to file a motion to sever. The similarities in details of the robberies, carjacking, and murder, as well as their closeness in time,

would have made evidence of one crime admissible at the separate trial of the other.  Mich. R. Evid. 404(b)(1) ("Evidence of other crimes, wrongs or acts . . . may [] be admissible for . . . scheme, plan, or system in doing an act . . . whether such other crimes, wrongs or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.").  Therefore, the petitioner suffered no prejudice from his counsel's failure to move for severance of the charges, because all of the other charges would have been admissible against him under state law. *Krist v. Foltz*, 804 F.2d 944, 947-48 (6th Cir.1986) (citing *Brown v. Ohio*, 432 U.S. 161, 167 (1977) (State courts have the final authority to interpret state law)).

Further, even if defense counsel should have sought severance— an action the State maintains was futile—the trial court's instruction that the jury must address each element of each crime adequately cured any possible prejudice from the joinder of the separate charges at one trial.  *United States v. Jacobs*, 244 F.3d 503, 507 (6th Cir. 2001); (1/30/07, Trial Tr. at 4; 2/4/07, Trial Tr. at 85-95.).  Because of the trial courts instructions, Treadwell was not prejudiced by any error of defense counsel.

66

For the preceding reasons, the Michigan Court of Appeals'
determination that counsel acted reasonably in failing to seek severance
of the charges was not contrary to, or an unreasonable application of,
clearly established Federal law. Claim II should be denied.

**C. Treadwell's remaining claims of ineffective assistance
of counsel are procedurally defaulted because he did
not raise them on direct review and he has failed to
present an argument to excuse that default. In the
alternative, even if this Court was to bypass the
default, the claims fail because they are meritless.**

**1. Treatwell's third, fourth, and fifth claims are
procedurally defaulted and he has not excused
that default.**

To the extent a petitioner deprives the state court of the
opportunity to review his claims by failing to follow reasonable state-
court procedures, review of the claims is barred. "[P]rocedural default
results where three elements are satisfied: (1) the petitioner failed to
comply with a state procedural rule that is applicable to the petitioner's
claim; (2) the state courts actually enforced the procedural rule in the
petitioner's case; and (3) the procedural forfeiture is an 'adequate and
independent' state ground foreclosing review of a federal constitutional

67

claim." *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

In this case, Treadwell failed to comply with the first two conditions. He failed to comply with a state procedural bar—Mich. Ct. R. 6.508(D)(3). Further, the state court enforced that bar. (10/12/10, Wayne County Cir. Ct. Opinion at 2.)

The last state court to issue a reasoned opinion on his claim was the Wayne County Circuit Court, which denied relief because he failed to present the claims on direct appeal. Here, the state trial court denied Treadwell's claim that he was denied the effective assistance of counsel on collateral review and held that he did not meet the burden under Mich. Ct. R. 6.508(D)(3). (10/12/10, Wayne County Cir. Ct. Opinion at 2-5.) This reason for denying relief constitutes a procedural default. The state court's reliance on Mich. Ct. R. 6.508(D)(3) was an adequate and independent state ground for denying review of his federal constitutional claims.

A State prisoner who fails to comply with a State's procedural rule waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged

constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 748-50 (1991); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). To establish cause, a petitioner must establish that some external impediment frustrated his ability to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Haliym v. Mitchell*, 492 F.3d 680, 690-91 (6th Cir. 2007). A petitioner must present a substantial reason to excuse the default. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Amadeo v. Zant*, 486 U.S. 214, 222-23 (1988) (reviewing a claim that a document was concealed by officials).

One recognized reason includes attorney error rising to the level of ineffective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). But here, Treadwell has not argued in any pleading to any court, state or federal, that he was denied the effective assistance of appellate counsel. Such a claim cannot now be raised to excuse his default.

The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent

69

of the underlying offense.  *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496.  A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). To show that his case is the "extraordinary" one warranting application of this exception, Treadwell must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 321, 327.  He has not presented any new, reliable evidence in support of a claim of actual innocence.  Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider the substantive merits of Treadwell's claims of ineffective assistance of trial counsel.

Claims III-V are procedurally defaulted, and habeas relief is barred.

    **2.**    **Even if this Court was to bypass the default, Treadwell is not entitled to relief because his remaining claims of ineffective assistance of counsel are meritless.**

In his third and fourth claims, Treadwell argues that his counsel failed to investigate and call an exculpatory witness.  In his fifth claim, he argues that his counsel was ineffective for failing to call an expert on false identifications and false confessions.  These claims fail because he has not established either prong of the *Strickland* analysis.

    **a.**    **Counsel was not ineffective for failing to investigate and call an exculpatory witness.**

Treadwell argues in his third and fourth claims that his counsel was ineffective for failing to investigate and call an exculpatory witness at trial.  Specifically, he argues that counsel should have further investigated Royce Ali because he was allegedly "identified as the shooter by a victim." (Pet. Attach. E at 14.)  Because these claims are related, the State will address them simultaneously.

The State trial court rejected these claims, applying the correct constitutional standard:

> Defendant argues that he was denied the effective assistance of trial counsel.

71

Effective assistance of counsel is presumed and defendant bears a heavy burden of proving otherwise. *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001). When reviewing a claim of ineffective assistance of counsel, a court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Rockey*, 237 Mich App 74, 76-77; 645 NW2d 887 (1999). "To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley (After Remand)*, 468 Mich App 135, 140; 659 NW2d 611 (2003). To demonstrate that counsel's performance was deficient a defendant must show that counsel's representation "fell below and objective standard of reasonableness . . . . In so doing, the defendant must overcome a strong presumption that counsel's performance constituted strong trial strategy." *Id* at 140. To establish that his counsels deficient performance prejudiced the defense, the defendant must establish that his counsel's representation was so prejudicial that he was denied a fair trial. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). This means defendant "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'" *Id* at 302-303, quoting *People v Mitchell*, 454 Mich 145, 167; 560 NW2d 600 (1997).

Defendant first argues that counsel was ineffective for failing to "investigate." However, defendant fails to explain what further investigation he believes trial counsel should have undertaken, or what information counsel may have discovered during an investigation that would have led to a reasonable probability that he would not have been convicted. A defendant may not merely announce his position and leave it to the court to discern and rationalize the counsels for his claims. *People v Watson*, 246 Mich App

72

572, 587; 629 NW2d 411 (2001).  Accordingly defendant is not entitled to relief from judgment on this issue.

Defendant next argues that counsel was ineffective for failing to call and exculpatory witness.  According to defendant, this potential witness, Royce Ali, was identified as a shooter by one of the victims and had gunshot residue on his hands.

Decisions regarding what evidence to present and whether to call or question[] witnesses are presumed to be matters of trial strategy.  *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999).  Counsel's failure to call a witness is considered ineffective assistance only if the failure deprives the defendant of a substantial defense.  *People v Daniel*, 207 Mich App 47, 58; 523 NW2d 830 (1994).  Defendant fails to explain what testimony Mr. Ali would have given which would have led to a reasonably likely chance of acquittal.  Although defendant claims that a victim identified Mr. Ali as a shooter, it is highly doubtful that Mr. Ali would have admitted to participating in the crimes if called by defense counsel.  Further, even if Mr. Ali was one of the shooters, it does not follow that defendant did not participate in the crimes.  Defendant was convicted under an aiding and abetting theory, and defendant admitted that he and three other men had guns on the night of the shooting, participated in robberies and attempted robberies within an hour and a few blocks away from [where] one of the victims was found dead.  Also, defendant told Investigator Barbara Simon that he shot at the victim who was later found dead. Considering the evidence against defendant, including his own inculpatory statements, defendant has failed to show that but for counsels failure to call Mr. Ali as a witness he would have had a reasonably likely chance of acquittal.

(10/12/10, Wayne County Cir. Ct. Opinion at 2-4.)  These

determinations were not objectively unreasonable.

With respect to Treadwell's claim that his counsel failed to investigate or prepare for trial (Claim III), he failed to present any argument to support that position.  Instead, he uses it to buttress his next claim (Claim IV)—that counsel was ineffective for failing to call Royce Ali to testify.  (Pet. Attach. A at 4.)  Royce Ali allegedly told the police that his friend was responsible for shooting Off. Charles Phipps. (1/31/07, Trial Tr. at 141-43.)  Also, Treadwell asserts that Royce Ali had gunshot residue on his hands and was identified by one of the victims as the shooter.

Treadwell is not entitled to relief because he cannot meet either prong of the *Strickland* standard.

First, he cannot demonstrate that his counsel performed deficiently in failing to call Ali to testify.  The trial record and Treadwell's pleadings are inconsistent as to what Royce Ali would have testified to at trial.  During trial, defense counsel asked the lead investigator on the case if Ali told them that one of Ali's friends shot the officer.  (1/31/07, Trial Tr. at 142-43.)  But then in Treadwell's pleadings, he argues that one of the victims identified Ali—not one of his friends—as the shooter and that Ali had gunshot residue on him.

74

(Pet. Attach. E at 14.)  These conflicting arguments do not support a finding that counsel performed deficiently—even Treadwell cannot definitively tell this Court what evidence Ali would have presented.

Second, even if he could show deficient performance—a point the State vehemently contests—Treadwell was charged with several crimes under an aiding and abetting theory.  So even if Ali would have testified that either he or one of his friends was responsible for shooting Off. Phipps, Treadwell is not off the hook.  As previously discussed, Treadwell himself *admitted* to his involvement in killing Off. Phipps.  In his confession, he acknowledges that he was present at the scene of the shooting, he was actively involved, and he got out of the car and fired his gun at the officer.  (1/31/07, Trial Tr. at 117-19.)  So, no matter who the other shooters were, Treadwell fessed up to aiding and abetting in Phipps' murder and the other crimes.

Because there is nothing present in the record establishing that defense counsel performed deficiently or that any prejudice resulted, the state court's determination that the claims of ineffective assistance were meritless was not objectively unreasonable.  Accordingly, Habeas Claims III and IV should be denied.

> **b.    Counsel was not ineffective for failing to call an expert witness on identification testimony and false confessions.**

Treadwell argues in his fifth claim that his counsel was ineffective for failing to call expert witnesses to testify on false identifications and false confessions.

Similar to the previous section, the State trial court rejected this claim, applying the correct constitutional standard:

> Defendant argues that he was denied the effective assistance of trial counsel.

> Effective assistance of counsel is presumed and defendant bears a heavy burden of proving otherwise. *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001).  When reviewing a claim of ineffective assistance of counsel, a court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Rockey*, 237 Mich App 74, 76-77; 645 NW2d 887 (1999).  "To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley (After Remand)*, 468 Mich App 135, 140; 659 NW2d 611 (2003).  To demonstrate that counsel's performance was deficient a defendant must show that counsel's representation "fell below and objective standard of reasonableness . . . . In so doing, the defendant must overcome a strong presumption that counsel's performance constituted strong trial strategy." *Id* at 140.  To establish that his counsels deficient performance prejudiced the defense, the defendant must establish that his counsel's representation was so prejudicial that he was denied a fair trial. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694

(2000).  This means defendant "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'"  *Id* at 302-303, quoting *People v Mitchell*, 454 Mich 145, 167; 560 NW2d 600 (1997).

* * *

Finally, defendant argues that counsel was ineffective for failing to call an expert witness to testify as to false identification and false confessions.  With regard to the expert on false identification, defendant argues that one was required because the victims could not identify defendant in a lineup but later identified him at trial.  As to an expert on false confessions, defendant argues that one was required because he testified at a *Walker* hearing and at trial that he had given a false confession.

Defendant has provided no proof that an expert witness would have testified favorably for him on either issue, and has therefore failed to establish the factual predicate for his claim.  *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).  Further, whether to present expert testimony is a matter of trial strategy and this Court defers to counsel's strategic decisions.  *People v Cooper*, 236 Mich App 643, 658; 601 NW2d 409 (1999).  Because defendant has failed to establish that the testimony of an expert witness would have led to a reasonably likely chance of acquittal, he is not entitled to relief from judgment on this issue.

(10/12/10, Wayne County Cir. Ct. Opinion at 2-5.)  This determination was not objectively unreasonable.

Regarding counsel failing to request an eyewitness identification expert, the Sixth Circuit has previously held that the failure of trial counsel to obtain an expert in eyewitness identification did not amount

to ineffective assistance of counsel. *Jackson v. Bradshaw*, 681 F.3d 753, 763 (6th Cir. 2012); *Perkins v. McKee*, 411 Fed. Appx. 822, 833 (6th Cir. 2011); *Ferensic v. Birkett*, 501 F. 3d 469, 483-84 (6th Cir. 2007)(citing *Dorch v. Smith*, 105 Fed. Appx. 650, 653 (6th Cir. 2004) (upholding as reasonable the Michigan Court of Appeals' conclusion that defense counsel's failure to call an expert witness on eyewitness identification counsel did not satisfy *Strickland*, because counsel cross-examined the eyewitness regarding inconsistencies in his identification of the petitioner). Here, defense counsel was similarly able to impeach the witnesses about what they saw the night of the shooting, emphasizing the discrepancies between their respective trial testimonies and their inability to identify Treadwell in pre-trial lineups.

Moreover, it is well established that decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy, and the failure to present certain evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Hutchinson v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002). Treadwell has not met this burden. None of the witnesses were able to identify him before trial. Any benefit that an

78

expert may have been able to provide would have been if the witnesses *had identified him prior to trial.* Because they did not and some only identified Treadwell at trial, defense counsel was able to exploit that the witnesses' testimonies were not reliable because they either did not identify him at all, or they waited until trial to do so. Such a strategy would undermine the strength of those witnesses' testimonies. As previously discussed, the fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *Moss*, 286 F.3d at 859.

Additionally, an expert witness on identification testimony was not needed or required.

Regarding counsel failing to call an expert to testify on false confessions, Treadwell has provided no evidence to surmount *Strickland*'s high standard. In fact, he has offered nothing other than speculation that an expert witness could have been obtained to provide such testimony on the issue of false confessions or that such a witness would testify favorably on behalf of Treadwell. Treadwell just states his position that "[s]uch false confessions are well known in our criminal justice system." Conclusory allegations of ineffective assistance of

79

counsel—without any evidentiary support—do not provide a basis for habeas relief. *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998). All Treadwell has presented is conclusory allegations. In the absence of proof that petitioner had an expert on false confessions who would have provided favorable testimony for him, he cannot show he was prejudiced by counsel's failure to call that expert. As a result, he has not met his burden under either *Strickland* or AEDPA.

Treadwell is not entitled to relief on Claim V.

## Conclusion

Treadwell procedurally defaulted his third, fourth, and fifth habeas claims and he has not shown cause and prejudice to excuse the default. In addition, he has not shown failure to review the claims would result in a fundamental miscarriage of justice. Accordingly, as detailed above, review of claims three, four, and five should be barred.

The state courts' rejection of Treadwell's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. He was "entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953); *United States v. Hajal*, 555 F.2d 558, 569 (6th Cir. 1977) ("[W]e have yet to review a perfect jury trial."). The state-court decisions in this case were not "so lacking in justification" that they resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87. The formidable threshold for granting habeas relief has not been met because fairminded jurists could disagree on the correctness of the state court's decision. *Yarborough*, 541 U.S. at 664. In other words, "if some fairminded jurists could agree

81

with the state court's decision, although others might disagree, federal habeas relief must be denied." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011). Here, there was no "extreme malfunction." *Richter*, 131 S. Ct. at 786. Consequently, habeas relief should be denied.

Additionally, the State opposes any requests for bond, oral argument, or any other relief, including a certificate of appealability. And the State asserts that Treadwell is not entitled to habeas relief because he has not established that the alleged errors had a substantial and injurious effect on the verdict in this matter. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

The State also contends that Treadwell has not demonstrated entitlement to discovery. "Habeas petitioners have no right to automatic discovery." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Rule 6(a) permits district courts to authorize discovery in habeas corpus proceedings under the Federal Rules of Civil Procedure only "for good cause." R. Governing 2254 Cases in the U.S. Dist. Cts. 6(a). "Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully

developed, be able to demonstrate that he is . . . entitled to relief.'"

*Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" *Williams*, 380 F.3d at 974 (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)). Habeas Rule 6(a). "Conclusory allegations are not enough to warrant discovery under Rule 6, rather, a petitioner must set forth specific allegations of fact." *Williams*, 380 F.3d at 974. Treadwell has not met this burden.

If this Court denies the petition, the State asserts that Treadwell is also not entitled to a certificate of appealability (COA) so as to proceed further. In order to obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the petitioner is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a

petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."''') (citations omitted).

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack*, 529 U.S. at 483-84. Likewise, when a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* at 484.

When a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or

84

that the petition should be allowed to proceed further.  In such a circumstance, no appeal would be warranted.  *Id.*

"The issuance of a COA must not be pro forma or a matter of course," and a habeas petitioner who seeks the issuance of a COA must show more than the absence of frivolity or the presence of good faith on his or her part in order to obtain a COA.  *Miller-El*, 537 U.S. at 337-38. Finally, a habeas petitioner's conclusory assertion that jurists of reason would find his or her claims to be debatable is insufficient to warrant the issuance of a COA.  *Bagby v. Saffle*, 53 F. App'x 25, 28 (10th Cir. 2002) (stating that the petitioner's "mere conclusory assertions to the contrary" are not enough to satisfy the burden).

## Relief

For the reasons stated above, this Court should deny the petition. The Court should also deny Treadwell any requested discovery, evidentiary hearings, bond, oral argument, and any other relief he seeks in this action, including a certificate of appealability.

Respectfully submitted,

Bill Schuette
Attorney General

s/Andrea M. Christensen

Assistant Attorney General
Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
christensena1@michigan.gov
P71776

Dated: September 20, 2013

20130040861A/Treadwell, Jason/Answer

86

**Certificate of Service**

I hereby certify that on September 20, 2013, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

HONORALBE CORBETT O'MEARA
MAGISTRATE JUDGE CHARLES E. BINDER

and I hereby certify that September 20, 2013 has mailed by United States Postal Service the papers to the following non-ECF participant:

JASON TREADWELL #338440
THUMB CORRECTIONAL FACILITY
3225 JOHN CONLEY DRIVE
LAPEER, MI 48446

Respectfully submitted,

Bill Schuette
Attorney General

s/Andrea M. Christensen

Assistant Attorney General
Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
christensena1@michigan.gov
P71776

87